S. Samuel Di Falco, S.
There are two proceedings before the court: an application by brothers and sisters of the decedent to revoke the letters of administration heretofore issued to Licia Anna De Camillis on the ground that she made misstatements of material facts in respect of domicile and her status as the widow of the decedent; secondly, a discovery proceeding instituted by the administratrix against Chemical Bank New York Trust Company (hereinafter Chemical) and Banca Commerciale Italiana (hereinafter BCI) to recover a certain sum allegedly on deposit with Chemical in the name of the decedent. At the beginning of the hearing, the parties raised the question of the *884 jurisdiction of this court to appoint an administrator in this estate. That issue is of particular importance to the hanks because protection to the banks against claims of third parties or as between themselves would come only from the order or decree of a court of competent jurisdiction. The court accordingly stated that it would hear first the issues relating to its jurisdiction over this estate. An understanding of the issues upon which jurisdiction depends makes necessary some review of the facts leading up to the granting of letters.
The administratrix (hereinafter, the respondent) filed a petition for letters of administration on November 8, 1968, alleging that she was the widow and sole distributee of the decedent, that he died domiciled at 270 Riverside Drive in.the County of New York, and that he left personal property in the County of New York with an estimated value of $223,000. The fact is — and it is now undisputed — that the decedent was domiciled in San Remo, Italy, at the time of his death, and for many years prior thereto. The respondent admits that fact in her answer. It is also conceded that the decedent had obtained a decree of annulment of his marriage to the respondent in the Republic of San Marino on January 7, 1956, but the respondent contends that such annulment was invalid and that she remained the lawful wife of the decedent up to the time of his death. It was established at the hearing that at the time of his death the decedent had no property in the State of New York, except for certain property of relatively small value which appeared to have been abandoned by him, the situs of which will be discussed hereinafter.
The decedent maintained two time-deposit accounts, with total dollar credits of $203,480 in the Milan main branch of BCI. He died on May 23, 1968 in San Remo. In August, 1968, some three months after his death, the respondent opened a checking account at a branch of Chemical located at 441 Columbus Avenue in the City of New York. The respondent had a personal account with Chemical at another branch. She presented herself at the Columbus Avenue branch on August 13 and arranged to open an account in the name of the decedent alone. According to the assistant manager of that branch, the respondent ‘ ‘ had requested two signature cards and she was going to see her husband in Italy, who was ill, and she would return the signature cards. ’ ’ The account was opened with a deposit of the respondent’s personal check in the amount of $20. The respondent admits the visit to the bank, but denies the representations respecting her husband’s condition. On September 12, 1968 *885 the respondent returned with two signature cards, though not the same ones given to her a month earlier. These cards bore her signature and one purporting to be that of the decedent. Oral statements and writing on the face of the cards indicated that the account was to be a joint account in the names of decedent and respondent. Of course respondent did not disclose the fact that one of the persons named as joint owner had been dead for several months. The cards were accepted and the account was made a joint account.
Meanwhile the respondent mailed a letter to BCI in Italy, purportedly signed by the decedent, bearing no date, requesting BCI “ to transfer as soon as possible the total amount of the two blocked accounts to my New York Bank: Chemical Bank New York Trust-Account No. 072-202610-441 Columbus Avenue, New York 10024, N. Y. Furthermore also include the interest earned and debit me your costs.”
BCI maintained substantial deposits with Chemical, and it cabled Chemical to credit the sum of $203,480 to the “ De Camillis Giuseppe Account 072-202610 ” at Chemical’s 441 Columbus Avenue branch and to debit BCI’s account with that sum. Chemical accordingly made the transfers, crediting- the joint account with a deposit of $203,480. Subsequently, BCI learned of the death of the decedent and instructed Chemical to reverse the entries. Chemical refused to pay the respondent and refused the request of BCI to reverse the entries pending a determination of the respective rights of all concerned. Thereafter, and in November, 1968, the respondent obtained letters of administration from this court. BCI and Chemical contend that the Surrogate’s Court of New York County has no jurisdiction over the estate of this nondomiciliary decedent because he left no property in the County of New York at the time of his death and no property of his remains unadministered in New York County.
Prior to the issuance of letters by this court, and on July 12, 1968, the brothers and sisters of the decedent, in accordance with Italian law and procedure, appeared before a notary of San Remo, declaring that the decedent died without any known will, that his marriage to the respondent was annulled by decision of the Law Commissioner of the Republic of San Marino on January 7, 1956, that the annulment was declared enforceable in the Republic of Italy by decision of the Court of Appeals of Naples on June 20,1958, and recorded in the marriage records of Naples, and that the decedent’s legal heirs were his brothers and sisters, whose names are stated therein. It is the contention *886 of the brothers and sisters that under Italian law this document was tantamount to the initiation of proceedings for the administration of decedent’s estate and the distribution of his property. The respondent was familiar with this proceeding because in July, 1968 .she commenced an action in the Supreme Court of San Remo, Italy, against the brothers and sisters of the decedent for a partitioning of the property and a recognition of her right to participate as lawful spouse.
The respondent contends that the letter to BCI and the signature cards were actually signed by the decedent. She and the decedent had been .separated, he living in San Remo and she in New York. The respondent went to San Remo during the first part of May 1968, the month in which the decedent died. Her contention is that the decedent wanted her to return and that he gave the bank letter to her sister in Italy, to be held by the sister and delivered to the respondent when she came to Italy. The suggestion is that this course of action was devised to induce the respondent to return to Italy and to the decedent. It is claimed that her sister delivered the document to the respondent when she arrived in Italy. Obviously, the account number could not have been placed in the letter by the decedent because no such account existed in May, 1968. The respondent testified that everything was in the letter when it was delivered to her except the account number, and that she later added the account number. She also admitted that she had placed in the letter the address of the decedent as being at the Gramercy Hotel in New York, a place where he had never lived. The original letter is typed and there is no indication on its face that insertions were later made in the text. It gives the appearance of uninterrupted and complete typing of the entire body of the letter. It is undisputed that the letter was mailed to BCI by the respondent after the death .of the decedent. It is also evident that when the respondent added to the letter the words: ‘ ‘ My present address is: Gramercy Hotel, 137 East 24th Street, New York City”, the necessary implication was that the decedent was living at the time the letter was sent. This was a patent misrepresentation.
It is argued by the .respondent that there are two other items of property which were located in New York County and would give this court jurisdiction to appoint an administrator, even if the BCI deposit were ignored. One of the items was a deposit of $46.50 in the East Brooklyn Savings Bank, which was later transferred to the abandoned property fund. The office of the East Brooklyn Savings Bank is in the County of Kings, and *887 hence that item of property obviously had no situs at all in New York County. The second item of property was a bond in the face amount of $100, issued by American Telephone and Telegraph Company, which has its office in New York County. However, the money to redeem the bond had been turned over to the State Comptroller and to the abandoned property fund in March, 1968, prior to the death of the decedent. The office of the State Comptroller and of the abandoned property fund is in Albany. There is no basis for saying that the situs of this property was in the County of New York at the time of the decedent’s death. Thus the jurisdiction of the court to appoint an 'administrator must depend upon the deposit in Chemical which was transferred by BCI after the death of the decedent. There was no property in the County of New York at the date of death of the decedent.
There is a sharp conflict among the parties with respect to the genuineness of the signature of the decedent on the two cards submitted to Chemical and on the letter sent to BCI. The petitioners in the revocation proceeding produced a handwriting expert who testified very positively that the signatures were forgeries and that the cards bore evidence of a tracing of the decedent’s signature thereon. The respondent produced a handwriting expert who stoutly maintained that the signatures were the genuine signatures of the decedent. It cannot be denied that there are suspicious features of the letter to BCI, such as the text which the respondent concedes that she inserted after the death of the decedent, other text which obviously she must have inserted, and the appearance of the instrument with its uninterrupted and even flowing type. However, it is not necessary now to determine whether the signatures were actually those of the decedent or were brazen forgeries. The unimpeached evidence in this record requires the finding that the respondent was guilty of making fraudulent misrepresentations to Chemical and to BCI. She clearly represented to Chemical that the decedent was alive when she opened the account in his name. The credible testimony shows that she made explicit representations. However, even if the respondent’s version of the transaction were accepted, her actions plainly amounted to a representation that the depositor in whose name the account was being opened was living on the day that she took cards from the bank for the purpose of obtaining his signature. The respondent plainly represented to BCI that the decedent was living on the day that the letter was sent to BCI. She admits that she inserted in the letter the statement that he was then residing at the named hotel, *888 a statement which was plainly designed to convince BCI that the decedent was living and was making the request on the date the letter was sent. It is patent that neither BCI nor Chemical would have assisted in any way in the transfer of the funds had either one been told that the decedent had been dead for some months before the transfer was taking place. The respondent’s representations were false and fraudulent and were designed to induce the banks to transfer funds which belonged to the estate of the decedent, to the respondent or to a place where she would be better able to gain control of them.
The respondent was also guilty of misrepresentations to this court. She represented that the decedent was domiciled in New York County when she knew that he never lived in New York County and that in fact he was domiciled in Italy at the time of his death. She failed to make a complete statement of the facts respecting her relations with the decedent, particularly his having obtained a decree annulling the marriage and her institution of proceedings against the heirs of the decedent in Italy to. declare the annulment void and to permit her to participate in the estate. She failed to advise the court of the proceedings which had, to her knowledge, been taken in Italy, the decedent’s undisputed domicile.
By “jurisdiction” we mean the power and authority of a court to hear and determine a judicial proceeding. (Bumstead v. Read, 31 Barb. 661, 665 ; Bergan, J. in Mattice v. Kingston Trust Co., 178 Misc. 256, 258 ; United States ex rel. Rudick v. Laird, 412 F. 2d 16, 20.) Frequently the determination of the extent of the judicial jurisdiction of a State may depend not so much upon what the State claims for itself as upon what other States will accord to it. Thus the power of a particular State to exericse authority through its courts over persons or property must be decided under established principles of conflict of laws. However, the fact that a State does have a well recognized jurisdiction to act through its courts in a particular situation does not necessarily mean that in fact it has given authority to a particular court to decide the matter or even that it has chosen to exercise its jurisdiction in such circumstances. (Restatement, Conflict of Laws 2d, Ch. 3, Introductory Note, par. [c].) The power which the State of New York Possesses over decedents’ estates and which the State has chosen to exercise has been conferred by the State upon the Surrogates’ Courts of the respective counties. With respect to the estates of nondomiciliaries, the Surrogate’s Court of New York County has been given jurisdiction to act when and if the nondomi *889 ciliary (¡a) ‘1 left property within that county * * * or (b) left personal property which since his death * * * has come into that county * * * and remains unadministered. ’ ’ (SOPA § 206, 207.) The power and authority thus delegated to this court would seem to accord with the power and authority generally recognized as residing in a State other than the State of domicile, with whatever necessary limitation the expression of the grant in abbreviated specific text could possibly create. (See 3 Beale, Conflict of Laws '§ 467.2; Restatement, Conflict of Laws 2d, § 314, 315.)
In the estate now before the court, there being no property of the decedent within this county on the date of his death, the question must be whether pr operty of this decedent came into this county after his death and remains unadministered, within the meaning of and scope of SCPA 206. The text of section 206, insofar as the present problem is concerned, remains unchanged since its enactment as section 2476 of the Code of Civil Procedure. That section conferred jurisdiction upon the Surrogate’s Court over the estate of a nondomiciliary who owned property ‘‘ which has since his death come into the State, and remains unadministered.” Section 2476 was construed by the Court of Appeals in Hoes v. New York, New Haven & Hartford R. R. Co. (173 N. Y. 435). In that case letters had been issued to the Public Administrator who thereupon instituted an action against the defendant to recover damages for alleged negligence in causing the death of the intestate. A judgment was rendered for the plaintiff. In the Court of Appeals the defendant argued that the letters of administration issued to the Public Administrator were null and void because the Surrogate was without any jurisdiction, on the ground that the decedent left no property within the State of New York ¡at the time of his death and that the property brought here after his death was brought into the County of New York for the ¡sole purpose of providing a basis for obtaining letters and instituting suit here. The defendant was held to have the right collaterally to attack a decree of the Surrogate’s Court on the ground of lack ¡of jurisdiction. The Court of Appeals ruled that it being undisputed that property of trifling value was brought into the State of New York in order to furnish a foundation on which to apply for letters so that the action could be maintained in New York rather than in Connecticut, there was presented 1 ‘ a case of collusion and legal fraud in the proceedings before the surrogate ” (p. 442). Referring to code section 2476, the court continued : ‘1 These provisions should be construed as meaning that the assets must * * * ‘ come ’ into the state, in good faith, *890 in due course of "business, and not for the avowed object of securing a resident plaintiff who can prosecute a negligence action against a foreign corporation on a cause of action arising in, and between residents of, another state The Appellate Division had determined that the Surrogate’s Court had discretion to entertain the application for letters, and, under such circumstances it was unwilling to disturb that exercise of discretion. However, the Court of Appeals said (p. 443): “ The trial court was confronted by no question of discretion, but by a question of law, resting on undisputed evidence, going to the jurisdiction; the disposition made of that question presents legal error reviewable by this court.” The Court of Appeals quoted with approval the rule stated in Woerner on the American Law of Administration (2d ed., pp. 442-443): “ Property brought into the State for collusive purposes, or temporarily, after the owner’s death, does not confer jurisdiction to grant administration thereon. ’ ’
A similar ruling was made in Pietraroia v. New Jersey & Hudson Riv. Ry. & Ferry Co. (197 N. Y. 434), wherein the defendant attacked the decree which appointed plaintiff as administrator of the assets of the person whose death was allegedly caused by defendant’s negligence. The decedent was a nondomiciliary, as was defendant. At the time of decedent’s death there was on deposit in a New York savings bank the sum of $500 in a joint account in the names of decedent and her husband. This deposit was used as the basis for the allegation in the administration proceeding that the decedent left property in New York at the time of his death. Obviously the sum on deposit passed to the survivor and was not property belonging to the decedent at the time of his death. The Court of Appeals held “ that fraud, or collusion, had been practiced in procuring the plaintiff’s appointment as administrator ” and that plaintiff was not entitled to .standing in our courts. (See, also, 3 Beale, Conflict of Laws, § 467.2, p. 1452 ; 1 Woerner, American Law of Administration [3d ed.], § 159, p. 557 ; vol. 2, § 205, p. 682.)
Lapiedra v. American Sur. Co. (247 N. Y. 25) also involved a collateral attack upon a decree of the Surrogate’s Court. One who had been appointed as administrator d.b.n. instituted an action against the ¡surety on the bond of the prior administrator to recover the value of assets received by the first administrator and not duly administered by him. The plaintiff recovered judgment. Although the first administrator had never actually been removed from office by decree of the Surrogate, the petition for appointment of the second administrator contained the allegation that the first administrator had been removed, an allega *891 tion that was made carelessly, not fraudulently. Letters had been issued on the basis of this petition. The defendant contended that the granting of letters to the plaintiff was void. The Court of Appeals ruled that the allegation in the petition, “though innocently made, was untrue and, because it was untrue as to a matter of record of which the petitioner was chargeable with notice, it amounted to a constructive fraud on the court of the same nature and effect as an actual and deliberate misrepresentation of fact. * # It was a fraud upon the court, directly affecting the jurisdiction of the court.” (p. 31.) The court held that the Surrogate’s Court had no jurisdiction over the subject matter, namely, the appointment of an administrator de bonis non, and said (p. 31): “Its letters were, therefore, void in the strictest sense, not merely void as against strangers to the proceeding.”
Nothing to the contrary was decided in O’Connor v. Huggins (113 N. Y. 511), Matter of McCabe (84 App. Div. 145, affd. 177 N. Y. 584) or Matter of Brown (131 Misc. 859). In Matter of Brown (p. 862) the assets were held to have been brought into New York “ in good faith and in due course of business ”. In the O’Connor case, it is true that the court ruled that when evidence is presented to the Surrogate, on the basis of which he decides the facts essential to his jurisdiction, his determination on the proof is not subject to attack in a collateral proceeding. In that case, however, the allegation of assets in the petition in the Surrogate’s Court was supported by an affidavit which set forth facts showing the existence of assets in the county. The defendant in the action for specific performance sought to disprove the allegation of property in New York. In holding that the adjudication upon the facts in the record could be set aside only on appeal, the Court of Appeals was careful to .say that this “ principle, of course, in its application to other parties affected, implies the absence of fraud, or collusion.” (p. 516). There appears to have been no contention in that case that there was any fraud whatever in the petition before the Surrogate.
The other cited case, Matter of McCabe, dealt with property brought into the State by a duly appointed foreign administrator, and held that such property did not remain ‘ ‘ unadministered ’ ’. The words in the 'statute, “ and remains unadministered ”, which were added by the Code of Civil Procedure, were intended to codify earlier decisions and make it clear that a grant of administration cannot be founded upon funds which are brought here or transmitted here in due course of administration by a foreign fiduciary. (Throop’s Notes, Code Civ. Pro., 1881, *892 § 2476.) However, those words do not mean that jurisdiction depends solely upon whether the property can be said to be under administration by a foreign fiduciary or not under administration by the person who brought it here. Wholly apart from the question whether the administration here represents an attempt to interfere improperly with an administration being conducted elsewhere is the question whether the property has come into this county properly or as a result of fraud and collusion.
It is argued that a different result was reached in Matter of Hughes (95 N. Y. 55). In that case a decedent, domiciled in Pennsylvania, left no assets in New York, but certain assets in Pennsylvania were brought into the County of Kings after his death and were in Kings County when letters of administration were granted by the Surrogate of Kings County. In the Court of Appeals, it appeared that the assets in the possession of the New York administrator were taken from Pennsylvania and brought into New York without authority of law and that the removal of the assets from Pennsylvania was illegal. It also appeared that there were no unpaid creditors in Pennsylvania and that the only persons interested in the distribution of the estate were New York residents. The court said: “Where assets so situated have been illegally removed from the jurisdiction of the domicile to the prejudice of domestic creditors or others interested in the estate, it would, we conceive, be the plain duty of the courts in another jurisdiction where they were found to direct their return to the jurisdiction of the domicile. This course would be alike demanded by a sense of justice and the comity of States. A removal under such circumstances would rightly be considered an act of usurpation to which courts would not lend their sanction.” (pp. 62-63). The courts found, however, that the removal from Pennsylvania was without wrongful intent, all of the people interested in the property were in New York, and the remission of the funds to Pennsylvania would result in double commissions and expenses. The Court of Appeals ruled that the Surrogate “ was not deprived of jurisdiction because the assets were irregularly brought here, nor does that fact deprive him of jurisdiction to decree distribution. The rights of all parties entitled to protection will be fully protected by a distribution by our courts. ” (p. 63).
The Hughes decision was distinguished in the Hoes case on the ground that in Matter of Hughes the finding was that the act was without wrongful intent, there were no persons interested in distribution except those in New York, there were no unpaid *893 creditors in Pennsylvania, and hence under such circumstances the court was not impelled to return the assets to the foreign jurisdiction, while in the Hoes case there was found to he collusion and legal fraud in bringing the assets here. The Court of Appeals decisions thus have established the principle that it is not the fact that the property has been wrongfully brought into New York that makes the Surrogate’s decree vulnerable, but rather the fraud and collusion which were designed to give a colorable jurisdiction which the court would not otherwise be deemed to possess.
The extent to which fraud will so invalidate a decree or judgment that it is subject to collateral attack rather than to an equitable proceeding to set it aside, is a subject on which there are varying views, or at least some imprecision in statement. (1 Freeman, Judgments [5th ed.], § 331.) Sometimes when a court speaks of lack of jurisdiction, it means only that a court will no,t generally exercise that jurisdiction in given circumstances. Thus it is said that while a State does have recognizable jurisdiction over a chattel which the owner has been induced by fraud to send into the State, the court will not generally exercise that jurisdiction. (Restatement, Conflict of Laws 2d, § 60, Comment c; Restatement, Judgments, § 32, Comment c.)
We need not now decide whether fraud such as revealed in this case deprives the court of jurisdiction essential to a valid decree or only makes it necessary for a State to decline to exercise jurisdiction over property within its borders, a course ‘ ‘ alike demanded by a sense of justice and the comity of States ’ ’ (Matter of Hughes, supra, p. 62). The conduct of the respondent in this case constituted a fraud upon the court, was in fraud of the rights of the relatives in Italy where an administration was being conducted in accordance with the law of the domicile, and was fraudulent as to BCI, rendering it liable to persons in Italy and possibly to the Italian Government. Under such circumstances this court cannot exercise jurisdiction over this estate, at least under present circumstances. Its plain duty is to direct return of the property held by Chemical to the domicile of the decedent.
The court accordingly holds that the letters of administration heretofore issued must be revoked. The petition in the discovery proceeding is dismissed. Pursuant to the authority granted in SCPA 2104 (subd. 5), the court will direct Chemical to credit the funds to BCI, as originally credited. The respondent will be directed to return to the State of New York such property as she collected under letters heretofore issued to her.